I call that, at this time, United States of America v. James R. Romans and others. I'm going to hear first from Mr. James Whaler. May it please the Court, Counsel. Good morning. There are three issues on behalf of Mr. Romans that I would like to address in my oral argument today. The first is the venue question that we raised at trial and in the briefs. The second would be the ex post facto application of the, for lack of a better word, stash house enhancement. And then third, address the life sentence in both a substantive procedural approach but also an Eighth Amendment cruel and unusual punishment analysis as well. First, I'd like to start with the venue argument. We believe that the evidence at trial failed to prove that element beyond a reasonable doubt. I know it's a preponderant standard that they have to prove at trial, but we believe the evidence fell short of that preponderant standard based on the evidence presented at trial. The evidence that the government relied on to establish venue in the case was the testimony of Mr. Ziegler and Mr. Pieper, Michael Pieper, Eric Pieper's brother, that they transported proceeds from the drug, marijuana distribution operation through the Eastern District of Texas. The evidence established that this conspiracy was formed in the Indianapolis, Indiana area. The marijuana was distributed in the Indianapolis area. The marijuana was offloaded in the Indianapolis area. And the testimony was very clear from Michael Pieper. I believe I asked him on cross-examination. The marijuana was offloaded in Indianapolis. The marijuana was distributed in Indianapolis. And then Mr. Pieper was part of the organization where he then collected the money, and the money was paid, the marijuana was paid for in Indianapolis to Mr. Cruz Acevedo. And so it's our position that based on those factors that the conspiracy was formed in Indianapolis, it was perpetrated in Indianapolis, and it was completed in Indianapolis. Who was Ziegler bringing the money to in Texas, driving through this district in Texas? He was bringing it down to Eric Pieper, who was one of the organizers of the conspiracy. Mr. Pieper had moved to Grand Prairie, Texas, which is located in the Northern District of Texas, not the Eastern District of Texas. I think the testimony said to go to school to pursue his Ph.D. And so he resided in the Northern District, and that's where the money came to Mr. Pieper here in Grand Prairie, Texas in the Northern District. Now, it's our position, too, that Mr. Ziegler, part of the analysis, too, is that he's not part of the conspiracy. Mr. Ziegler ran a tissue bank and had a business and helped Mr. Pieper launder money through that business, and then he brought it down to Mr. Pieper. And that money laundering conspiracy that they were involved in was separate and apart than the marijuana distribution operation up in Indianapolis. Are you arguing that he only, that Mr. Ziegler only drove through the Eastern District, that there was no overt act in particular, including the payment of any profit? That is correct, Your Honor. The testimony clearly at trial said that he simply drove through Texas, and he had a map that showed the route he took. But that's the only act he committed in the Eastern District of Texas. Okay. And so that's the one issue. I think the other two No transfer of funds or anything of that nature in the Eastern District? Not in the Eastern District. Now, I do think the government may rely on the fact that Mr. Pieper and others may have purchased some real estate in Frisco, Texas, which is in the Eastern District. But the testimony at that time showed that those acts didn't happen until November or December of 2010. Our position at that time, Mr. Romans had been arrested in August of 2010, and Michael – Eric Pieper testified at a trial that Mr. Romans was no longer part of the organization. He would not deal with Mr. Romans. And so, therefore, those acts that occurred in Frisco, Texas, have no relation to Mr. Romans' participation in the conspiracy. So – and then also, just to be clear, Michael Pieper did drive money, we believe the testimony showed, through the Eastern District, but there was never a transfer of the money. Is there any evidence that Mr. Romans was engaged in any drug activity or money laundering activity after he was arrested or after he was released? No, Your Honor. The evidence shows that he did not. I think there's a suggestion that he attempted to – wanted to continue in the organization, but Eric Pieper said, I didn't have anything to do with him and didn't deal with him. And so, Mr. Romans can't be a conspiracy of one at that point, and so, therefore, he's no longer part of the organization. And so, from the venue issue, the evidence failed specifically as it related to that. What about the government's argument that there was circumstantial evidence that the drugs themselves, given that they came in on the border in Texas, likely went through this district? Well, I know that's something they're going to argue, but I think the evidence was simply, oh, there may have been some discussions, but there was never any hard evidence to show that the shipment actually came up from McAllen through the Eastern District. They say it's probable. The case they cite in their brief dealt with kind of the same issue. There's circumstantial evidence, but the distinction in that case was there was testimony from co-defendants that we distributed the controlled substances in the Eastern District. So, it wasn't simply a transportation issue. There was additional evidence to support that. So, our opinion, our view is that there's not enough evidence to support that conclusion just based on the fact there may have been a meeting in McAllen that marijuana came through the Eastern District. Is there another district that could accommodate this case? Yes, I think the Northern District may have potentially, of Texas, could have accommodated it because there was some evidence that Mr. Pieper and others talked and bought phones and dealt with, talked to each other and had an agreement in the Northern District with Texas. I think that could have accommodated it, and the district up in Indianapolis would have been an appropriate venue for the case, but the Eastern District, we don't believe, established that. If there's any other questions about that, I'd like to move on to the Stash House application and the ex post facto application. I understand, I know it's going to be a plain error. I did not raise it, object to it at the time of sentencing, but I think when you look at the application of the enhancement, that became effective November 2010. Mr. Romans, as stated earlier, was arrested in August of 2010, and his participation, in our view, the evidence showed, ceased at that time, and so therefore his conduct can't be imputed to whatever occurred after August 2010. The indictment was returned in June of 2011, but from August 2010, his participation ceased, and so therefore we believe that the application of that was improper, and therefore that would have a substantial effect on his rights because a two-level reduction at that point would make his guideline range would have been 360 to life, and then if he eventually receives a two-level reduction retroactive, which he can apply for, his then guideline range would be 292 months to 365 months, and so it has a substantial impact on his rights, and even under a plain error review, it survives because it's an ex post facto application of that. And then finally, as it relates to the life sentence, we believe that should be reviewed and overturned under, first, under 3553. I mean, the mantra under 3553 is it should be sufficient but not greater than necessary, and we believe that based on receiving a life sentence under the facts of this case was greater than necessary under, based on his background, he had zero criminal history points. Granted, he had criminal history, but he scored a zero, and all the factors combined, it was greater than necessary under the facts of this case. Secondly, we would argue under the Eighth Amendment, it's disproportionate. Obviously, Eric Pieper received 145 months, and we conceded that he did cooperate and plead guilty, and obviously he got the benefit of that, but I think when the main mastermind of it, Eric Pieper, is receiving 145 months compared to Mr. Romans, I think on its face, it's grossly disproportionate. And then also, I think under the categorical approach, I think it also fails as well. I think in their brief, we cited that, you know, the trend is that these life sentences for nonviolent drug crimes are not in favor anymore. The President, President Obama, has commuted multiple sentences, and I think there's pending legislation now to change these mandatory minimums, change these life sentences, and so I think under the categorical approach and the prevailing norms we have today, his sentence applies. His life should be overturned. Thank you. Thank you, Mr. Whalen. I'm on rebuttal. Mr. Brandt for Mr. Hardin. Good morning. May it please the Court, Counsel. Jeff Brandt for Kevin Hardin. Kevin Hardin received a sentence of 30 years, 360 months on conviction for this conspiracy. Mr. Hardin didn't voluntarily waive his right to counsel but was forced into that position as a result of what we believe is a wrongful denial by the magistrate judge for second counsel. Mr. Hardin had four written requests for new counsel, multiple oral requests. This was not a last second, last ditch effort that so many of these cases are that have been before this Court and the other circuits where a defendant right before trial asked for new counsel or in the middle of trial asked for new counsel. Instead, this was a fight from November 2011 to June 2012. The magistrate judge originally ruled that Mr. Hardin was not competent to represent himself, and we believe that was the right ruling. Why? He had three surgeries in 2007 to correct a ruptured aortic valve. There were complications in the first surgery. In the second surgery, he had a period where he was not getting oxygen. These are in the transcripts for the motions for the psychiatric evaluation and for new counsel and for the bond hearing. Mr. Hardin had great pain leading up to trial, and the only way to treat that, said the nurse that testified, would be hydrocodone or the equivalent, Lortab. But the prison obviously was not going to give these types of medications to Mr. Hardin. In the May 2012 hearing, the magistrate judge asked him, is the medical condition going to prevent your ability to give a thoughtful process and understanding of what you're doing if you're representing yourself? And he said, unequivocally, yes. In the June 2012 hearing, the magistrate judge says, do you think you're competent? He didn't say yes. He said, I have to be. Why? Because he couldn't get just a second attorney. Some of the best cases in Mr. Hardin's favor for getting a second, just a second attorney, actually come from the government's Rule 28J letter recently filed. The first case was United States v. Moore. That defendant had five attorneys before the ruling saying, you can't get any more. In Jones v. Walker, that defendant lost, but not on the merits. It was a 2254. It was the AEDPA. Those crazy constrictors of the AEDPA is why that defendant lost. Quote, the majority agrees that Jones would be entitled to relief if on direct appeal. He didn't lose because he didn't deserve a second attorney. He lost because it was his burden of proof and because of the hands-off standard of review on the AEDPA. King v. Bobby that the government cites, that defendant had three attorneys before denied another one. In U.S. v. Massey, that defendant refused all counsel. Court appointed, retained. He wanted no counsel at all. He wasn't asking for a mere second attorney. The magistrate judge seems to have refused to give Mr. Hardin. Let me back up. The magistrate judge fails to get a knowing waiver of the right to counsel only because an unreasonable decision not to permit that second attorney. And the magistrate judge on the record appears to recognize the difficult position the magistrate judge is in, saying the only reason you want to proceed is because you don't want second counsel. And that's in the record at USCA 5171, the first volume of the record. There was an easy solution, and it was to appoint second counsel. We join Mr. Romans on the motion for venue, motion for dismissal for lack of proof of venue. Similarly to Mr. Romans, the evidence did not show that there was any connection to the eastern district. We agree that the appropriate districts to try this case were the northern district of Texas or the southern district of Indiana. Mr. Hardin's counsel— The southern district of Texas might have been a better venue, too, because that's where the drugs were brought into the country, I think, right? Correct. Mr. Hardin—this is a serious crime. Mr. Hardin received 30 years. He was 38, almost 39, four months away from being 39 at sentencing. Thirty years. His attorney argued at sentencing for a downward departure based upon age, and we cited the Payton case. We recognize that's not a Fifth Circuit case. But the district court judge did not address age in response to Mr. Hardin's argument, and we believe that that was an error, a procedural error, and that a sentence lower than 30 years was sufficient but not greater than necessary. Mr. Brandt, let me go back to your argument regarding the appointment of counsel and the second—you said that he was not offered an opportunity for second counsel. Did I read correctly on the—I believe it's the June 5, 2012 hearing where he was asked—he asserted that he wanted to represent himself, and the district judge, I believe, or the magistrate specifically asked him, do you still want to represent yourself even if subsequent counsel were appointed or available? Is that not what the transcript reflects on that date? I agree, and at that point, I think Mr. Hardin felt that he was doing everything he could to represent himself. I can't deny that's in the transcript. I think that's an ant compared to a mountain on the record, but absolutely. I think it's difficult to understand how the magistrate judge could feel confident in Mr. Hardin's answers all the time in light of the pain he was going through. He would often stop in the middle of a sentence and have to restart. Not that I haven't done that three or four times this morning, and that doesn't mean you're incompetent, I hope, but the record is very clear that he is struggling mightily to try to get a new attorney, somebody that he can communicate with, somebody he doesn't go two months without hearing from either with a visit or with a response to a letter, despite going through great pain. But his response isn't like the one in the case law that you cited about, well, I have to. I think he says, yeah, I'd like to represent myself in response to the question. It's a little bit more affirmative than an answer that appears to be born out of some compulsion or lack of understanding of access to second counsel. But elsewhere in the record, at least twice, he is saying, I don't want to. Do you want to? No, I don't want to. Should I look on that date, that June 5th date, for that as well as what I've just mentioned? A citation? Is it other places on the record? Are there other places that I could find him, again, operating under some sense of compulsion? On the bottle, I'll have a citation. It's in the brief, and I'll find it. Okay. Thank you. Thank you. Okay, Ms. Talamantes. Yes, Judge, thank you. Good morning. May it please the Court. My name is Tiffany Talamantes, and I represent Defendant Appellant Bae June Mosby. I'd like to focus and begin and focus my time on the district court's application of a two-level sentencing enhancement for possession of a dangerous weapon. This enhancement was erroneously applied by the district court because the government has failed to establish a spatial and temporal connection between the guns found in Mr. Mosby's home in Arlington in June of 2011 and the drug trafficking activity in the instant offense. It's undisputed that the weapons found in the closet in Mr. Mosby's home were not found with any drugs, and there's no evidence of any drug trafficking activity occurring in Mr. Mosby's home. And, in fact, I'd like to point to the Court's attention that in November of 2010, Eric Pieper testified that Bae June Mosby came down from Indiana. For the entire time of the conspiracy, before November 2010, all the drug trafficking activity occurred in Indiana. He came down in November of 2010, and then in December of 2010, Eric Pieper testified that he no longer, he never spoke to Bae June Mosby again. So from December of 2010 to the time Mr. Mosby is arrested in June 2011, there's no evidence of any drug trafficking activity. So I think that goes to the temporal connection. At sentencing, in the supplemental authorities provided by the government, they point to hydroponic lab equipment found in the home to say drug paraphernalia was found with the weapons. But I think the problem with that contention is that that hydroponic equipment is in no way, there's been nothing in the record to establish that relating back to the drug trafficking activity and the conspiracy prior that happened in 2010, between 2006 and 2010. What about the fact, I think he had two guns, one was a handgun, the other was an automatic rifle. And I know in some of the case law or even in the 924C context, which is somewhat analogous where it's a substantive offense to have a gun in connection with a drug trafficking offense, the Court says you can look at the type of weapon, and while a handgun is something, or even a hunting rifle is something that is commonly just kept in a home, an automatic rifle might be more indicative of drug trafficking. Well, that might be true, Your Honor. I think my thought in response to that is that it's unclear from the record whether any of these weapons were loaded. There was also ammunition found, but to me that would indicate that the weapons weren't loaded. And also, I think what's relevant is the spatial and temporal connection to the drug trafficking activity. That hydroponic lab equipment has no connection to drug activity. Eric Pieper testified that his drug supply was from Mexico. Badrian Mosby was a customer, not a supplier. There's no evidence that Badrian Mosby was growing marijuana. So I think the notes and the equipment, although in spatial connection to the weapons, I don't think satisfies the nexus between the drug trafficking activity and the incident offense. What about the money orders? I know there are only a couple of them, but if they were proceeds, if the district court could logically conclude that, then the case law would say that. Yes, Your Honor, and I think to the money orders and to the notes, the district court and the government have both focused on a code sheet.  For example, in the Mitchell case, cited by the government, where the government points out that a crack pipe in connection with a piece of paper, I believe with phone numbers, was found. But to distinguish, in that case, the defendant who was challenging that enhancement had been found twice during the course of that conspiracy with weapons. Mr. Badrian Mosby was never found during the course of this conspiracy with weapons. There was no testimony that he was seen with weapons. The government points to a 2003 arrest of Eric Pieper. That's long before this conspiracy started. My time is up. Thank you. Mr. Perez. May it please the court, counsel. I'm going to address the issue of venue, like the co-counsel has. This is regarding overt action, furtherance of the conspiracy. And what I want to talk to you about are the acts that actually Terrence Booker was involved in and how they weren't involved and how they weren't part of Eric Pieper's testimony. There were no contacts, drug-wise, with Eric Pieper after Pieper went to the Northern District since June 2009. My client took a trip after that time to Dallas, but he'd vacationed with the Piepers before. And there was no testimony from Eric Pieper that there was any drug business discussed during that time. Del Ziegler collected money, brought it back down to the Northern District, but there was no discussion, there was no testimony that Mr. Ziegler collected money from my client after Mr. Pieper moved. Now, there was a part in the testimony where Mr. Ziegler said that he had collected from my client one time $10,000 and decided that he wouldn't do that because my client was indiscreet, but this was prior to Eric Pieper moving to the Northern District. When Eric Pieper testified for several hours, he talked about some drug ledgers, spreadsheets that had a lot of transactions on there. My client was not on it. There was no documentation that money was received from Booker regarding the spreadsheet, and there was no testimony as to regarding any specific events that my client was involved in after Mr. Pieper moved. As far as my client being involved with Mr. Mosley and Mr. Harden, now there was some testimony regarding a 2010 arrest where the detective testified outside the presence of the jury that my client said that he was involved with Mr. Harden and Mr. Pieper, which would have been December 2010 after Pieper moved to Dallas over the Northern District, but that wasn't put in front of the jury, so that wasn't anything that the jury could consider. Regarding that, the testimony regarding Mosley and Harden going down to Dallas at this boxing match in November 2010, now Eric Pieper indicated, testified that they had discussed business, and it actually talked about portions or cuts that they were going to do, percentage of cuts, but there was no testimony that an actual meeting of the minds created an ongoing and workable business relationship. As was stated earlier, around December 2010, Pieper's drug business started to break down and started to dissipate. Now, my client was arrested in 2010 after Eric Pieper, Pieper moved to the Northern District. He had five Ziploc bags with hardly any signature kind of packaging. It didn't match the kind of signature packaging from the arrest in 2009 where it was in boxes with a carbon paper, which was a signature wrapping of the Lopez Acevedo supplier. There were no phones purchased from my client when Mosley and Harden were down in Dallas at that time. I keep saying Dallas, but I mean in the Northern District, which had been Garland. A couple other things. The government tried to imply, implicate my client based on a couple of other things. One was a house or going down to try to purchase a house. Now, remember that Eric Pieper and my client had been lifelong friends since high school, and it's not odd that my client would consider moving down to the Northern District. And when we're talking about moving from Indiana to Texas, I think I'd rather be in Texas too, the climate, everything else. My client's wife was sick at the time, dialysis, using dialysis stuff, and this would have been a better climate for her to be in. So that was considered. There was never any testimony that that home would be used as a stash house, as it was with Michael Pieper, and didn't establish what district that house would have been in. Regarding the purchase of the vehicle, that was nothing that the court brought in regarding my client's, what they had said were overt acts in Dallas, but it's not an overt act, Your Honor. There was no testimony that the car was to be used for transporting drugs, money, or was purchased by drug proceeds. There was no discussion where the vehicle was purchased. We join and adopt by reference co-counsels and co-appellants briefs and reply briefs of James Romans, Kevin Harden, and Virginia Mosley on the issue of venue and the district court's ruling on the defendant's motion for acquittal on venue. Thank you. Thank you. We hear now from Ms. Hagan for the government. Good morning. Terry Hagan for the United States. May it please the court, I think to answer many of the arguments that were raised this morning, we need to start with the genesis of the conspiracy. This major drug trafficking organization began in 2006 and continued at least until January 11, 2012, when the first superseding indictment was returned. During that time, they distributed 50 to 60,000 pounds of marijuana and generated $40 million in drug proceeds in revenue. The two indictments charged 17 individuals as members of the conspiracy. And we know from the record that at least two people pleaded guilty without being indicted. One of those people was Dale Ziegler, who was one of the first people who came in the door. You heard that he worked for a human tissue bank. It's my understanding that because he had some sort of medical license and came in early and cooperated, he was allowed to plead to money laundering. But Mr. Ziegler was still a part of the drug trafficking conspiracy. He, in fact, testified that it was his job, his role, to, on behalf of Eric Pieper, pick up drug proceeds and bring them to Eric Pieper. And Mr. Pieper testified that Mr. Ziegler's role was to pick up money from several of the individuals here, meaning in the courtroom. And he would either store those for me or would transport them to me down to Texas, or he would buy things for me as well. Anywhere he drove from Indiana to Texas, in your view, he could have been prosecuted in any of the states he drove through. That's right, and that's because in conspiracy cases, value lies in any district where the offense was begun, continued, or completed. So you may be asking yourselves, why the Eastern District? And like you pointed out, Judge Costa, any place between Indiana and where he ended up with the drug proceeds, when they were paid as part of the conspiracy, had venue. Look at where we were when this case was indicted. At that point, we had three of the co-conspirators who had moved from Indiana to Texas. Three had first moved to the Northern District, one in Grand Prairie, one in Burleson, and the other in Arlington, Mr. Mosby. Then you have Mr. Pieper, one of the two he met of the conspiracy, who moves to the Eastern District. Mr. Pieper said once he moved here, he continued to run the drug conspiracy, and he did. Loads of marijuana were still going to Indianapolis, despite the fact that he was now in Texas. The Eastern District of Texas takes drug trafficking very seriously. Could it have waited longer to get more acts and furtherance of the conspiracy? Sure, but why? We had venue. The result of waiting would have been putting more marijuana back on the streets, and we wanted to nip it in the bud. And as a result, the case was indicted. But it seems to me even, I mean, the standard is fairly low. You just have to show one overt act. That's the way the case law is developed. But there's also, as with everything, there's prosecutorial discretion. So whether you've met the overt act or not, I mean, we'll have to sort that out. Whether you have or not, we'll see. But even if you, under the case law, have some small hook to bring the case in the Eastern District of Texas, it does seem to me as a matter of prosecutorial discretion, it's important that cases are brought where the jury pool is drawn from the community where the crime was really being carried out and affected. That's why the founders put the venue right in both the Constitution and the Sixth Amendment. It's a right, first of all, the defendant to be tried by people from their community, but second of all, a right of the community to address crime that is allegedly taking place in their community. It just seems like the Eastern District's connection is very negligible if it exists at all, certainly compared to Indiana. Well, we don't know what was going on in Indiana from the record, so I can't comment on that. But I believe that one of the reasons that Congress made the conspiracy statute so expansive was so that districts who had the resources and who had venue over these sorts of crime are able to prosecute them. And I think if you— Districts have different priorities and thresholds, and the agencies shop the cases, and there might be a case that Houston and Dallas, the big cities, don't want to bring, but they can find another district that might have lower thresholds. But I don't know what happened here. And I think we should also look at the marijuana itself. When this conspiracy formed, James Romans and Eric Pieper, the two key men in charge of the conspiracy, went down to Mexico. They got their marijuana from Cruz Lopez Acevedo, who was bringing it in the country through El Paso. Okay, so he could—they could have avoided and probably did avoid going through the Eastern District at that time. But in 2007, the quality of the marijuana that Mr. Lopez Acevedo was supplying was inferior. And as a result, Beijing Mosby was sent down to McAllen and may have—maybe didn't—may have gone into Mexico to take care of the problem. When he was down there, he had two goals. His first goal was to inspect the marijuana that would be coming from and through McAllen to make sure that it was acceptable. His other duty was that he was to inspect a motor home or an RV that was already loaded with that marijuana and ready for transport to Indianapolis. So we know that that initial load did come from McAllen, Texas, and as the government argued in closing the argument using Mr. Ziegler's atlas, it was most reasonable, most likely, there was a preponderance of the evidence to show that the marijuana that came from McAllen, Texas, went one of three routes through the Eastern District of Texas. And not only was there that one specific load, but in addition to that, Mr. Pieper testified that after they got that load, they got a lot of loads of marijuana from McAllen. So, circumstantial evidence shows that that's the second way that the government had been used. His testimony relates only to the entry point of McAllen, and then on top of that, you have the atlas that would demonstrate or suggest that that was taken one of three routes, all three of which would go through the Eastern District? That was the government's argument in closing, asking the jury to use their common sense, because someone carrying that much marijuana is going to want to get from point A to point B as quickly as possible. And then there's yet another way that the government has been used, and that is with the relocation of Michael Pieper when he moved to Texas. Michael Pieper moved to Burleson, Texas, in the Northern District, after his house, which he was using as a stash house, was searched by police in Indiana. They did not find any marijuana. What they found were 30 to 50 boxes lined with carbon paper that had held marijuana that had been shipped in from Cruz Lopez Acevedo. Michael Pieper was worried, and I think it's evident that Eric Pieper was also worried about losing one of the people that he relied on most to deliver marijuana and to pick up drug proceeds, because Michael Pieper could be arrested in Indianapolis because he's been identified now. Police know where the stash house is. So for him to continue in the conspiracy, they have to get him out of Indiana, and that's just what they do. He was moved to Texas and traveled through the Eastern District of Texas for the express purpose of not only continuing the duties that he had before, but taking on a new role, and that role, according to Eric Pieper, was that Michael Pieper would then start dealing directly with Cruz Lopez Acevedo to arrange the marijuana shipments up to Indianapolis, and he did that. Eric Pieper testified that about one month after Michael had moved to Texas, he arranged the delivery of a shipment of marijuana to Mr. Romans, Mr. Mosby, and Mr. Harden. In addition, Michael Pieper took his brother Eric. Shortly after that, I'm going to find this. He took his brother back up to Indiana about a week after that delivery, where Eric Pieper picked up over $50,000 in drug proceeds from James Romans at Mr. Romans' son's birthday party. So Michael Pieper continued to be involved in the conspiracy because of the move, and we know that he traveled through the Eastern District of Texas, too, because he was following Dale Ziegler, who was pulling a trailer, and got stopped, and DPS issued a warning ticket to him for driving on the shoulder in Texarkana, Texas. So the whole move was in furtherance of the conspiracy. So venue was appropriate in the Eastern District. I think I would like to move on to Mr. Harden's arguments. The Fifth Circuit in the Fields case said that a defendant is only entitled to substitute counsel if the court finds that there is significant interference with an existing attorney's ability to provide zealous representation. And the court cited an Eighth Circuit case and also said that this follows logically from the fact that defendants are not entitled to counsel of their choice. The record here shows that Mr. Harden was playing games. Mr. Harden was being a difficult client. He was difficult for the court to deal with. What it also shows is that Mr. Smith was doing the very best that he could to provide zealous representation for him. If you look at the things that Mr. Smith says that he had done during the first time they actually had a hearing on Mr. Harden's second complaint, Mr. Smith said that he had met with Mr. Harden a number of times. He had filed another motion for pretrial release. He had, at his own expense, gotten all of Mr. Harden's medical records from Parkland Hospital. He had reviewed all the evidence and the discovery with the defendant, and he was hoping to have a meaningful discussion about the impending plea deadline, which would have been the following Friday. So Mr. Smith was doing the very best that he could to represent Mr. Harden. And in that hearing, the true motivation for Mr. Harden wanting to get rid of Mr. Smith came out because Mr. Harden said he was mad because Mr. Smith would not do everything that he told him to. Well, in the Moore case, this court said that defendants are not entitled to counsel who will docilely do as they are told, and that was the kind of attorney that Mr. Harden wanted. During the second hearing, we learned that Mr. Smith said he had visited Mr. Harden frequently in the past three months. They had discussed motions that Mr. Harden wanted him to file, and Mr. Smith told Mr. Harden that he would be using his professional judgment. And that's when we learned about the two grievances, which I think the magistrate accurately called a tactic to try to get the magistrate to remove Mr. Smith. But those were frivolous grievances as shown from the fact that the grievance committee that heard them, both of them dismissed them without a hearing. So as far as the contention that Mr. Harden was anything but competent, the record shows that he was competent. At the end of that hearing, when the government, when Mr. Harden said he wanted to go pro se and the government pointed out, wait a minute, Judge, at one of the detention hearings, he said he has pain and he can't understand the nature of the proceedings. The judge said, okay, I'm not going to allow you to go pro se. Hearing was called. But before they went off the record, Mr. Smith said, I never had any problem dealing with Mr. Harden. He seems competent to me, in other words. And the magistrate judge even said that Mr. Harden did not appear to have any trouble understanding what is happening. So then we get to May 29th when counsel, out of an abundance of caution, as he says during the hearing, files the motion for a psychiatric examination. The following day, Mr. Harden filed his motion to proceed pro se. So during the hearing on those two motions, the magistrate judge first took up the motion regarding the psychiatric state. And Mr. Harden kept saying he was competent, yes, he was competent, he could understand. Finally, I think he said he did not know if the pain would affect him. And the government pointed out that based on the record, the letter that Mr. Harden had filed, it showed that he understands the nature of the charge and the proceedings against him. And then the judge asked Mr. Smith, is Mr. Harden competent? And Mr. Smith pointed out that he had been able to go through the discovery with Mr. Harden, and that when they were discussing the discovery, that Mr. Harden made some very astute observations concerning contradictions in the government's evidence. So at that point, the judge said not only does he deny the motion for the psychiatric examination, he says he believes that Harden was competent. And so then, as Judge Engelhardt pointed out, when the magistrate judge sought to ascertain if this waiver was also knowing, he asked Mr. Harden, if I were to appoint another counsel, you wouldn't want to go represent yourself, would you? And he said, yes, I would. And at that point, the judge went through every question in the bench book, in the Feretta case, and ascertained that not only was Mr. Harden's waiver voluntary, because he refused to accept the only constitutionally entitled counsel that he had, but his waiver was also knowing. So now I'd like to turn to the arguments for Mr. Booker. Now, in this case, Mr. Booker kept getting arrested. He was arrested three different times, and every time that he was arrested, we learned that there was a little bit more evidence that came out that he was a member of this same drug trafficking conspiracy. On his first arrest, June 25, 2008, he had two pounds of marijuana and told police that he got it from Philippe. Philippe was Lopez Acevedo's one of his runners. Of course, he's not going to say he got it from Eric Pieper. That's his direct person. So he implicates Philippe. The next time that Mr. Booker was arrested, on April 10, 2009, there was a total of about 80 pounds of marijuana, and his house was searched. What did they find? A lot of boxes lined with carbon paper, which was the manner that the drug trafficking conspiracy used to conceal their marijuana to avoid detection by law enforcement. They also found a receipt from Elon Furze, which was the company that was issuing paychecks as a means to launder the drug money to these co-conspirators. And they also found, when they searched the home, 10 pounds of marijuana and a ticket to Dallas-Fort Worth for travel, February 28, 2009. Mr. Ziegler said Eric Pieper told him to buy a ticket for, I think he said, for Mr. Booker to come to Dallas. And then the last time that Mr. Booker was arrested, in December 2010, he was arrested with five pounds of marijuana, and he got to tell the jury that he got this marijuana from other members of the conspiracy. Of course we know, because of what he said outside the jury's presence, that he got it from Hardin and Mosby. So the evidence does show that the jury could make a reasonable inference that Mr. Booker was indeed a member of the one and only single conspiracy. And they were given the multiple conspiracy charge. I guess you're going to get to the sentencing issues. You have a few minutes left. Can you address Mosby's argument about the gun? I mean, it does seem a much weaker connection than most of the cases where that's applied. And I think probation, in fact, withdrew the enhancement after there was an objection, but then the government still tried to prove it up and the judge found in your favor. But basically you've got, what, there's two money orders? Is there any evidence of actual drug trafficking in that home? There were money orders. There was evidence connected to this conspiracy itself, and Judge Crone found that the code words that the conspirators were using that were found with those weapons, that there was testimony that Mr. Mosby shared those code words so they knew what to call. But you need a gun to protect code words? I mean, the whole rationale is you need a gun. If you're using a gun to protect the drugs, which people obviously want, to protect the proceeds, which people obviously want, I mean, or even a list of a ledger of customers, but code words, I mean, I don't think that's a highly sought-after document by people outside the conspiracy who might be trying to. Right. The lab itself, the hydroponic lab, cost $5,000 to $6,000, I think. There was evidence that he was buying marijuana seeds. He had the words Stoquin. But no drug sales out of that house in evidence? No drug sales. There was a purchase of a carbon dioxide tank, which an officer testified to would increase the yield and the quality of the marijuana. And Judge Crone said that it would be naive to believe that someone involved in this large of a conspiracy would be growing tomatoes. But there was evidence about hydroponic marijuana. Eric Peeper said that he purchased hydroponic marijuana from Cruz Lopez Acevedo and ounces from James Romans, and that James Romans got it from Gary Hanley. So it looks like there's at least an argument that they may have been dealing in hydroponic marijuana as well. Ms. Hager. Yes, sir. Have you fully addressed Mr. Romans' ex post facto argument? No, sir, and I would like to. Mr. Romans did not meet his burden of proof. Mr. Romans had to prove that he had to make a substantial showing of withdrawal, abandonment, or defeat of the conspiratorial purpose through an affirmative act on his part. And an arrest just does not do it. And I would like to point out that Mr. Mosby, back in 2007, after he was pulled over and identified by police, was shut out of the conspiracy. He was shut out first for six months, and then Eric Peeper said, we need to shut him out for six more months because if he's not indicted within six months, then he's safe to deal with. So this conspiracy has evidence that if they suspect someone may be a weak link and would cause them to get arrested and actually end the conspiracy, they don't want to deal with them until they are sure that the person is not cooperating with the government or will not lead to their own demise. So rather than withdrawing from the conspiracy, the government brought the evidence that Mr. Romans was right back in there. He called Eric Peeper not once but repeatedly. He told Eric Peeper that he had Jeremy Martin, he had Gary Hensley, and he had Smith, his other big customer, ready to buy marijuana. He told Mr. Peeper that instead of taking the drugs up front, he would pay cash for them. So Mr. Romans had absolutely no intention of withdrawing from the conspiracy. He wanted back in, and consequently, that premises adjustment applies to him. The venue, if you're concerned that there weren't any acts taken after the people moved to Texas, while he was still involved, there were. Mr. Ziegler picked up marijuana from James Romans 90% of the time, he said, and he said the biggest sum of money that he picked up from James Romans at any one time was $90,000 to $100,000. So Mr. Peeper was not out of the conspiracy, and the premises adjustment applied, mostly because he was using the body shop to distribute those vast quantities of marijuana that he was selling to his customers. I think your time has long expired, so thank you very much. Yes, sir, and thank you for permitting me to answer the question. And we stand on our brief and ask you to affirm. Thank you. Mr. Whalen, you have. May it please the Court, Counsel. Real brief, as it relates to the venue and dealing with the McAllen issue, I think the evidence is just purely speculative because why they put in an atlas to show what Gary Hanley, the route he took, then they say, well, the atlas is there, we're going to take the most direct route. Well, then, is it also plausible that the word is out that the Eastern District is the toughest place to be, so we're going to do everything we can to avoid it? Well, it's just a preponderance. It's just a more likely than not. I know. It's a preponderance, but still it doesn't even rise to that because it's simply speculation because what if they had the meeting at McAllen, but the source is in Laredo, and there was testimony from Michael Pieper that their sources, they received marijuana from Chicago and Arizona. So there's no consensus of where the marijuana is coming from, and so I think that argument fails. And as it relates to the money, it's not being reinvested. The money that came down to Texas is not being reinvested. It all occurred in Indianapolis, and the venue issue fails. Thank you. Thank you, sir. Mr. Bratt. Thank you. In Mr. Smith's own words, he had no, quote, real ability to have a meaningful dialogue with Mr. Hardin to go over the evidence and the discovery, and that's ROA 4916. The government makes a point about Mr. Smith's capability, but the magistrate judge at one point is denying Mr. Hardin's motion because, quote, Mr. Smith's capable and that he wanted to stay on. But then Mr. Smith's moving to get out, and there's case law that says that even if an attorney is competent, a serious breakdown in communication can result in inadequate defense. U.S. v. Lott, the Tenth Circuit case, 310 F. 3rd, 1231. And then Judge Englehart, it's on pages 7, 8, and 12 of that same hearing where the court asks, do you think you're competent? Mr. Hardin says, I have to be. Do I want to do it? No, but I have no choice. And finally, I'm not. I'm seeking to represent myself because Mr. Smith ain't doing his job. Excuse me, doing his job. Thank you. Thank you, sir. Ms. Talamantes. May it please the Court. Briefly, Mr. Mosby has joined co-defendants and appellants in the venue argument, and as to the McAllen transfer, we cited a Tenth Circuit case, which obviously is not finding but persuasive that rejects that exact type of speculative evidence to establish even by a preponderance standard venue. As to any evidence during the time of the conspiracy concerning hydroponic equipment, the government has no contention from what I heard that that had anything to do with Mr. Mosby. Again, we've got the six months when Eric Pieper testifies that he doesn't talk to Mr. Mosby again, after December 2010. So we've got six months. There's no drug trafficking activity. Everything related to Mr. Mosby and drug trafficking activity occurred in Indiana. And with that, I'm going to give some time back to the Court. Thank you. Thank you. Mr. Perez. Oh, you have nothing, but you used up your time. Okay. Thank you very much. The case will be submitted.